UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
KRISTENE HAYWOOD, individually          )
and as next friend of KG, a minor,      )
                                        )
        Plaintiff                       )
v.                                      )        C.A. No. 4:24-cv-40071-MRG
                                        )
FITCHBURG PUBLIC SCHOOLS,               )
                                        )
        Defendant                       )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Kristene Haywood, individually and as next friend of KG, a minor ("Ms.

Haywood")[1] opposes the motion of Defendant Fitchburg Public Schools ("FPS") to dismiss all of

her claims in this case.[2]  Ms. Haywood brings her claims for herself and on behalf of her child

KG, who was subjected to humiliating and discriminatory treatment by her kindergarten teacher.

The discrimination at issue in this case concerns KG's protective hairstyle, specifically wearing

her hair in braids with beads according to her Black family's longstanding cultural heritage and

tradition.[3]  KG was told that she could not attend kindergarten at her FPS school without

removing the beads from her hair, and ultimately was required to transfer schools.  She has

---

[1] Throughout this document, the Plaintiff intends for "Ms. Haywood" to refer to Ms. Haywood in both of her capacities although certain aspects of the claims are brought only in her capacity as parent/next friend to KG.

[2] As indicated below, Ms. Haywood waives and assents to the dismissal of claims asserted under the Massachusetts Civil Rights Act, which were not delineated as separate counts in the Amended Complaint but which were referred to in conjunction with the claims articulated under 42 U.S.C. § 1983.  As also indicated below, Ms. Haywood waives her Procedural Due Process claim based on and subject to FPS' apparent concession that M.G.L. c. 76 § 5 affords a remedy under the circumstances of this case.

[3] As used here, the term "protective hairstyle" is defined by M.G.L. c. 4 § 7.

experienced significant emotional distress as a result, and KG continues to experience anxiety and fear in connection with her hair.

FPS has failed to respond reasonably to Ms. Haywood's many attempts to seek redress. Yet despite the state and federal statutes and constitutional rights prohibiting race discrimination by public schools, FPS claims that Ms. Haywood and KG have no legal recourse at all.  Because binding legal precedent says that the Amended Complaint states multiple plausible claims for relief, FPS' motion should be denied.

### Facts[4]

At all times relevant to this case and currently, KG has been a minor child attending an FPS public school.  KG and her mother are Black, and Ms. Haywood takes pride in celebrating Black culture.  She strives to pass that pride on to her children through teaching and example, including the way KG has worn her hair since before she began attending school.

Black Americans have a long tradition of using hairstyles as a form of cultural expression, and there is an equally long history of discrimination against Black Americans on the basis of hair.  That history has been well-documented, and has recently led to legislative activity in both state legislatures and Congress.  On July 26, 2022, Massachusetts enacted language referred to as the "Massachusetts CROWN Act,"[5] which prohibited discrimination against "protective hairstyles" including the hairstyle worn by KG.  A few months later, the U.S. House passed what would be a federal version of the same law.[6]

---

[4] Ms. Haywood refers to and incorporates here the allegations in her Amended Complaint, which as FPS acknowledges must be presumed true for purposes of its Motion to Dismiss.

[5] "CROWN" is an acronym standing for "Creating a Respectful and Open World for Natural Hair;" the acronym is used by activists promoting passage of similar legislation and by state and federal legislators themselves.

[6] As of the date of this filing, the bill has not become law.

Notwithstanding widespread and well-publicized discussion of hair discrimination and protective hairstyles, FPS failed to implement any policies, training, or practices to protect its students' rights to be free from this particular form of discrimination. As a result, KG's kindergarten teacher Ms. Boutwell was unprepared to handle sensitively a situation in which she felt compelled to address a "problem" she perceived with KG's hair. Rather than discuss her concerns with Ms. Haywood, Ms. Boutwell humiliated KG in front of her classmates and told her she needed to remove her beads and braids.

Ms. Haywood did not learn of this incident and the directive that KG alter her protective hairstyle until KG was set to return to school after a required quarantine related to her sister's COVID-19 diagnosis. She immediately called Ms. Boutwell to express her concern and explain that KG's hair reflected an important component of her identity. Ms. Boutwell stood by her contention that the beads and braids were "distracting," and the issue was not resolved.

Ms. Haywood then met with Justin Sparks, the Interim Principal of KG's school at the time, to discuss her concerns about KG's apparent disparate treatment. Principal Sparks told Ms. Haywood that Mrs. Boutwell was apologetic about her remarks, and that he wanted to meet with Ms. Haywood and Mrs. Boutwell together. On December 1, 2021 Ms. Haywood met with Principal Sparks, Mrs. Boutwell, and Eva Kelly, the school choice officer at the school. During that meeting, Ms. Haywood once again explained that she was concerned not only about the comments regarding her daughter's hair, but the apparent insensitivity to the racist undertones behind those comments.

Mrs. Boutwell offered a perfunctory apology for her remarks, but then alleged for the first time that KG's hair posed a supposed "safety" issue and made vague comments about having her own "native children at home." These statements seemed calculated to distract from

Ms. Haywood's concern that KG was being treated differently on account of her race, and they offensively implied that Ms. Boutwell's personal circumstances were somehow analogous to Ms. Haywood's.  Mrs. Boutwell also appeared to threaten Ms. Haywood with litigation for slander.

At this meeting, Ms. Kelly agreed to help KG transfer to a new school if Ms. Haywood wanted her to.  On or about December 6, 2021 Ms. Haywood met again with Principal Sparks and discussed KG's transfer to Crocker Elementary School, though it was certainly not what she and KH had wanted and imposed further challenges on her.  That same day, Principal Sparks acknowledged in an email that KG had felt like she did not belong at Reingold Elementary School and that he needed "to have further conversations with this teacher and as a school community."

Separately, Ms. Haywood met with FPS Superintendent Robert Jokela and requested that Ms. Boutwell be required to undergo anti-bias training.  Superintendent Jokela did not appear to take Ms. Haywood's concerns seriously and said that anti-bias training plans were "in the works" but might not happen until the following school year.  It was clear to Ms. Haywood that FPS had not conducted or arranged for any training that would have adequately prepared its teachers and administrators to understand the importance and cultural context of protective hairstyles as now defined in M.G.L. c. 4 § 7.  It was likewise clear to Ms. Haywood that the District was uninterested in taking action to address the underlying causes of what had happened once it perceived KG's situation as having been "resolved" via KG's transfer to a new elementary school.

On or around December 9, 2021, KG transferred to Crocker Elementary School. Following her transfer, KG has continued to exhibit signs of distress and trauma.  For example, KG refused to ride the bus to school because she was afraid of how other children would

perceive her.  KG continued to ask Ms. Haywood if she could have the braids and beads taken

out of her hair, because she was afraid "her new teacher and friends [wouldn't] like her."  KG

now wears her hair in braids, but remains unwilling to put beads in her hair out of concern for

how they will be viewed by teachers and classmates.  KG continues to suffer stress and anxiety

every time she has her hair done, to the point that it causes her body to shake, and has lost sleep

as a result of the stress and anxiety.

On or about July 1, 2022, Ms. Haywood sent a letter through her counsel to FPS in

compliance with the presentment requirement set forth at M.G.L. c. 258 § 4.  After Ms.

Haywood sent her presentment letter to FPS, the Massachusetts Appeals Court issued its decision

in *John Doe v. Cambridge Public Schools*, 101 Mass. App. Ct. 482, (Mass. App. Ct. 2022),

which announced for the first time that in order to comply with M.G.L. c. 258 § 4 a putative

plaintiff asserting claims against a school district must send her presentment letter to the mayor

or chief executive officer of the city in which the school district lies.  On or about October 3,

2023, Ms. Haywood sent a second presentment letter through her counsel to the Mayor of

Fitchburg in compliance with the holding in Doe v. Cambridge Public Schools.  Neither FPS nor

the City of Fitchburg provided a substantive response of any kind to either presentment letter.

Separately from the two presentment letters, Ms. Haywood filed a complaint against FPS with

the Massachusetts Commission Against Discrimination.  Neither FPS nor the City of Fitchburg

provided a substantive response of any kind to the MCAD filing.

### Standard of Review

A complaint need only contain "a short and plain statement of the claim" with "sufficient

factual matter to state a claim to relief that is plausible on its face." *Rodriguez-Reyes v. Molina-*

*Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013), quoting Fed. R. Civ. P. 8(a)(2) and *Grajales v.*

*Puerto Rico Ports Auth.,* 682 F.3d 40, 44 (1st Cir. 2012).  To determine plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937 (2009).  Plausibility does not mean probability, but simply "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "[E]ven if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely," a claim can still have sufficient plausibility for a motion to dismiss to be inappropriate. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955 (2007).

The pleading standard does not require the use of certain magic words without which dismissal must follow.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.  "[A] court may not insist on the allegation of 'specific facts' that would be necessary to prove the claim at trial." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 10 (1st Cir. 2011).  For purposes of evaluating a motion to dismiss, the facts must be viewed in "the light most favorable to the plaintiff." *Id*.

## Discussion

I.    **Counts I through IV of the Amended Complaint state claims against FPS pursuant to 42 U.S.C. § 1983 and 42 U.S.C § 2000d based on FPS' deliberate indifference to KG's rights.**

A local government entity such as a school district can be held liable under 42 U.S.C. § 1983 and 42 U.S.C. § 2000d for actions that constitute deliberate indifference to violations of constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  A failure to train municipal employees can constitute deliberate indifference when the municipal actor ignores a "known or obvious consequence" of that failure. *Id.*, quoting

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997).  Alternatively, a response to a known harm can constitute deliberate indifference if the response is "clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648, 119 S. Ct. 1661, 1674, 143 L. Ed. 2d 839 (1999).

    a.  <u>Discrimination against students on the basis of protective hairstyles was a "known or obvious consequence" of FPS' failure to train its teachers on those hairstyles and implement policies to prevent such discrimination.</u>

In this case, the risk of hair discrimination against students in FPS schools was or should have been well known prior to the initial incident at issue in this case.  Hair discrimination has been a topic of significant public debate and litigation for years.[7]  California passed the first state version of the CROWN Act in 2019.[8]  The United States House of Representatives passed a federal version of the CROWN Act on September 21, 2021.[9]  According to the 2021 Dove CROWN Research Study for Girls, 53% of Black mothers report their daughters suffering hair discrimination starting as young as five, KG's age at the time of the initial incident at issue in this case.[10]  The same study quoted one student respondent as saying "my mom had to come to

---

[7] *See* Website, NAACP Legal Defense Fund, available at: <u>https://www.naacpldf.org/natural-hair-discrimination/</u> (describing litigation of discrimination dating back to 2010); *see also* Powell, Crystal, "Bias, Employment Discrimination, and Black Women's Hair: Another Way Forward," BYU Law Review Vol. 2018 Issue 4, available at <u>https://digitalcommons.law.byu.edu/cgi/viewcontent.cgi?article=3177&context=lawreview</u>.

[8] *See* Press Release, CROWN Coalition, July 3, 2019, available at: <u>CROWN Act Passes In California — The Official CROWN Act</u>.

[9] *See* NPR, "The House passes the CROWN Act, a bill banning discrimination on race-based hairdos," March 18, 2022, available at <u>https://www.npr.org/2022/03/18/1087661765/house-votes-crown-act-discrimination-hair-style</u>.

[10] *See* Study, 2021 Dove CROWN Research Study for Girls, available at: <u>CROWN Act Resources — The Official CROWN Act</u>.

my school because my teacher said that she could do my hair better than it was . . . [and that] it looked like she didn't care about me."[11]

Despite the attention paid to hair-based discrimination, FPS appears to have implemented no policies, practices, or trainings specific to the issue before KG's teacher told her she needed to alter her protective hairstyle before returning to school.  Appropriate training and/or policies could have prevented KG from what ended up being a traumatic event with ongoing effects. Under the specific circumstances of this case, Ms. Haywood has a claim for violations of 42 U.S.C. §§ 1983 and 2000d based on FPS' deliberate indifference to the need for training and policies that would protect its students against a common form of discrimination.

    b.   <u>FPS' response to Ms. Haywood's report of the initial discriminatory incident constituted deliberate indifference to KG's rights, those of Ms. Haywood, and those of students in the district more broadly.</u>

Separately from FPS' failure to implement adequate training and/or policies that would have prevented the initial incident in this case, FPS engaged in deliberate indifference through its response to Ms. Haywood's complaints.  Other than a meeting in which Ms. Boutwell offered an apology (while also threatening apparent legal action), the only response offered by FPS was to allow KG to transfer to a different elementary school.  Although that may have separated her from Ms. Boutwell, it imposed the cost of action on KG.  FPS did not respond meaningfully at all to Ms. Haywood's repeated requests that training be conducted, other than Superintendent Jokela's vague references to "anti-bias training plans" that were "in the works."

Merely responding in some form to a violation of constitutional rights does not suffice to avoid liability for deliberate indifference. See, e.g., *Leader vs. Harvard Univ. Bd. of Overseers*, D. Mass., No. CV 16-10254-DJC (Mar. 17, 2017).  That FPS helped arrange for KG to transfer

---

[11] *Id.*

schools and offered a tepid apology does not equate to a meaningful response.  In response to Ms. Haywood's entreaties for training and policy responses, FPS did nothing.  In response to Ms. Haywood's two presentment letters and an MCAD filing, FPS did nothing.  "Doing nothing is the classic case of indifference." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020).

FPS' inaction is even less excusable given that Massachusetts enacted the CROWN Act less than a month after Ms. Haywood sent her first presentment letter and more than a year before she sent her second.  Though it should have been clear before, the adoption of the CROWN Act clarified that race discrimination for purposes of M.G.L. c. 76 § 5 extends to discrimination on the basis of protective hairstyles such as KG's. *Cf.* M.G.L. c. 76 § 5 and M.GL. c. 4 § 7.  Yet that did not in any way alter FPS' approach to Ms. Haywood's efforts to seek redress.

 After Principal Sparks, Superintendent Jokela, and FPS more broadly had actual knowledge of KG's experience, FPS failed to respond reasonably to Ms. Haywood's repeated entreaties for corrective action.  FPS did not follow through on meaningful training of teachers or policies specific to hair discrimination and protective hairstyles.  This was despite significant media coverage of the Massachusetts CROWN Act, legislation that was debated and ultimately enacted while Ms. Haywood was still actively trying to communicate with FPS about her concerns.  The failure to act has exposed KG and her fellow FPS students with protective hairstyles to an unacceptable, ongoing risk of discrimination in violation on the basis of race.

## II.    **Ms. Haywood's First Amendment claim does not require dismissal of her Equal Protection claim.**

FPS contends that Ms. Haywood cannot maintain an Equal Protection claim while also prosecuting a First Amendment claim "to the extent there is overlap between them," and cites

*Pagan v. Calderon*, 448 F.3d 16, 36 (1st Cir. 2006). In *Pagan*, a pharmaceutical company and some of its shareholders sued the governor of Puerto Rico based on the refusal to grant a loan. *Id.* at 24. The First Circuit concluded that the plaintiffs' claim of an Equal Protection violation based on "political discrimination" was nothing more than a restatement of their First Amendment claim. *Id.* at 36-37.

By contrast, in this case Ms. Haywood's Equal Protection and First Amendment claims are premised on different interpretations of the same facts. On the one hand, FPS violated KG's right to be free from discrimination on the basis of race. On the other, FPS violated KG's right to freedom of expression. Those are distinct rights, whereas in *Pagan* there was only one right at issue. Consequently, Ms. Haywood should at least be allowed to proceed with these alternate theories of liability for violations of hers and KG's constitutional rights.

**III.    Contingent on FPS' concession that M.G.L. c. 76 § 5 applies to the circumstances of this case, Ms. Haywood would be willing to waive her Procedural Due Process claim.**

FPS seeks dismissal of Ms. Haywood's claims for violations of Procedural Due Process rights on the basis that Massachusetts has afforded an adequate remedy in the form of M.G.L. c. 76 § 5. Yet even while it claims Massachusetts has afforded an adequate remedy, FPS apparently argues that Ms. Haywood's pursuit of such a remedy is foreclosed by the Massachusetts Tort Claims Act. See FPS Memorandum at p. 17. If and only if FPS is prepared to concede that M.G.L. c. 76 §§ 5 and 16 afford Ms. Haywood a remedy under the circumstances of this case, subject to FPS' exhaustion argument addressed below, Ms. Haywood is prepared to waive the Procedural Due Process claim.

**IV.    Ms. Haywood waives any claims asserted under the Massachusetts Civil Rights Act.**

Though not broken into separate counts, Ms. Haywood's Amended Complaint refers to claims under the Massachusetts Civil Rights Act, M.G.L. c. 12 § 11L ("MCRA") for violations of rights enshrined in the Massachusetts constitution.  Although some doubt arguably exists as to whether school districts themselves are immune to suit under the Massachusetts Civil Rights Act, it seems very likely that the sovereign immunity enjoyed by municipalities extends to school districts.  Accordingly, Ms. Haywood waives any claims under the MCRA and assents to the dismissal of those claims specifically as requested by FPS.

### V.     Ms. Haywood agrees that the Court should exercise supplemental jurisdiction over her state-law claims.

While acknowledging that "as a general principle" dismissal of Ms. Haywood's federal claims would result in the dismissal without prejudice of her state-based claims, FPS asks the Court to retain supplemental jurisdiction over the state law claims.  Ms. Haywood agrees, because of the risk that dismissal of her state law claims at this point might present a statute of limitations issue when she attempted to refile them in state court. See *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995), citing *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir.1994) and *Newman v. Burgin*, 930 F.2d 955, 963 (1st Cir.1991) for the proposition that the potential running of the statute of limitations on a state claim "is a salient factor to be evaluated when deciding whether to retain supplemental jurisdiction."  It remains somewhat unclear what limitations period applies to M.G.L. c. 76 § 16, but the statute's reference to "tort" suggests that the standard three-year limitations period applies.  Without conceding that she would be precluded from refiling her Massachusetts claims in state court in the event the Court declined supplemental jurisdiction, Ms. Haywood agrees with FPS' request that the Court should exercise its discretion to retain jurisdiction over her state claims regardless of the disposition of her federal claims.

### VI.    <u>Count I states a claim for violations of M.G.L. c. 76 § 5.</u>

FPS excluded KG from admission to school, or otherwise discriminated against her, on the basis of race, when it conditioned her attendance on removal of her protective hairstyle.  This occurred because KG's teacher insisted on this condition, but that would not have happened had FPS implemented training and policies specific to protective hairstyles.  FPS violated M.G.L. c. 76 § 5 by failing to implement such training and policies; by failing to reverse the teacher's decision when the Plaintiff brought it to their attention; and by failing to communicate further with the Plaintiff when it became clear that KG was going to switch schools.  Moreover, KG still faces an unacceptable risk of being effectively denied educational benefits on the basis of her protective hairstyle.  She and her mother therefore have a remedy pursuant to M.G.L. c. 76 § 16.

### a.    <u>M.G.L. c. 76 § 16 does not have an exhaustion of remedies requirement.</u>

FPS' argument for dismissal of this claim rests entirely on its position that the statute requires plaintiffs to first comply with an exhaustion of remedies provision.  But the Massachusetts Supreme Judicial Court has already made clear that "recovery in tort is permissible, without any statutory prerequisite, 'if the refusal to admit or exclusion was unlawful.'" *Goodwin v. Lee Pub. Sch.*, 475 Mass. 280, 289 n. 10 (2016).  In *Goodwin*, the SJC underscored the pointlessness of an administrative exhaustion requirement where the exclusion was unlawful: "a statement to that effect by the school committee, which had no involvement in the superintendent's decision to affirm the suspension, would add nothing more to establish the reasons for the plaintiff's unlawful exclusion." Id.  The *Goodwin* decision results from a straightforward interpretation of the statute's plain language: the law requires the school committee to provide written reasons for a student's exclusion from school "on application,"

without in any way suggesting that recovery in tort is condition on such application being made. M.G.L. c. 76 § 16.

Only state courts "can define and interpret state law." *Schlesinger v. Councilman*, 420 U.S. 738, 755, 95 S. Ct. 1300, 1312, 43 L. Ed. 2d 591 (1975). The Court must therefore follow the binding decision of the SJC in *Goodwin* rather than the decisions in *Harrington v. City of Attleboro* 172 F. Supp. 3d 337, 353 (D. Mass. 2016) (Casper, J.) and *Doe v. Holly*, CV20-10139-LTS, 2022 WL 1038012 (D. Mass. Feb. 25, 2022) (Sorokin, J.), cited by FPS. The decision in *Harrington* was made before the SJC issued its decision in *Goodwin*. *Doe v. Holly* simply cites *Harrington* for the proposition that a plaintiff had to seek redress, without considering the conclusive decision in *Goodwin*, and the court did not devote much analysis to the issue given that Doe had failed to respond at all to the defendants' exhaustion argument. Neither decision supports dismissal in this case.

FPS attempts to distinguish *Goodwin* on the facts, by emphasizing the case's focus on M.G.L. c. 71 § 37H½. Not applicable in this case, M.G.L. c. 71 § 37H½ authorizes school principals to suspend students who have been charged with felonies. Students suspended under that statute have a right to appeal to the superintendent. The SJC found the statute inapplicable to Goodwin, too, because at the time of her suspension no felony charges had issued. *Goodwin*, 475 Mass. at 287. But Goodwin had brought her claim for relief under M.G.L. c. 76 § 16, and the Lee Public Schools argued that she was barred from relief because she did not obtain a statement from the school committee under § 16. *Id*. at 289 n. 10. The SJC rejected that argument, holding that although plaintiffs could use such statements to prove unlawful action they were certainly not prerequisites to recovery in tort. *Id*.

    b. <u>Even if M.G.L. c. 76 § 16 had an exhaustion of remedies requirement, Ms. Haywood has fully met the requirement.</u>

Even if the Court were inclined to ignore the binding SJC precedent interpreting M.G.L. c. 76 § 16, ignore the statute's plain language, and conclude that it contained an exhaustion of remedies requirement, that requirement has been met here.  As alleged in the Amended Complaint, Ms. Haywood made the following efforts to communicate with FPS following the initial phone call with KG's teacher described in Paragraphs 22-25:

- Two meetings with Principal Sparks, on November 30, 2021 and December 6, 2021;

- A meeting with Superintendent Jokela on or about December 8, 2021;

- A complaint filed with the Massachusetts Commission Against Discrimination;

- A presentment letter sent through her counsel on or about July 1, 2022; and

- A second presentment letter sent through her counsel on or about October 23, 2023.

Thus, there were at least six separate instances on which Ms. Haywood made an effort to seek redress with FPS officers, employees, agents, and FPS itself.

Without explaining its reasoning, FPS argues that none of these efforts satisfies the exhaustion of remedies requirement.  Yet no authority whatsoever supports its position.  Even the *Harrington* and *Doe v. Holly* cases do not, because in those cases the plaintiffs had made apparently no effort at all to communicate with the school districts.  Here, Ms. Haywood's efforts were extensive.  It would be an absurd outcome if a plaintiff who filed a complaint with the MCAD and complied with the Massachusetts Tort Claims Act's presentment requirement through two separate letters were found not to have met the very minimal bar referenced in *Harrington* and *Doe v. Holly*.[12]

---

[12] FPS misleadingly contends that "the presentment letter" does not satisfy the statutory requirement because it "does not seek exhaustion or relief from the School Committee."  In fact, there were <u>two</u> presentment letters and both plainly sought redress in the manner contemplated by the statute.  To the

c.  <u>Alternatively and additionally, even if M.G.L. c. 76 § 16 had an exhaustion of remedies requirement, then it also accounts for a futility exception and exhaustion was futile in this case.</u>

There is a rich irony to FPS' insistence that Ms. Haywood needed to exhaust administrative remedies.  After Ms. Haywood's meeting with Superintendent Jokela, FPS completely ignored her repeated efforts to communicate.  FPS filed no response to her MCAD complaint and served no response to either of her presentment letters, even though both M.G.L. c. 272 § 98 and the Massachusetts Tort Claims Act require responses.  Despite complaining that Ms. Haywood did not attach copies of the presentment letters to her Amended Complaint, FPS has not contended that the letters were not received.[13]

No case appears to discuss the issue of whether the supposed exhaustion of remedies requirement in M.G.L. c. 76 § 16 is subject to a futility exception.  Of course, that may partly be because the SJC has held there is no such requirement in the first place.  In fact, the SJC's decision in *Goodwin* essentially says that it would be futile to have such a requirement.  Yet if the statutory language can be stretched so far as to create an exhaustion of remedies requirement, it can also be read to include a futility exception.  Indeed, the decision in *Harrington* contemplated a futility exception. *Harrington* at 172 F. Supp. 3d at 353 (suggesting that the plaintiffs could have "explained" their failure to seek redress).  Because the statute's language

---

extent that FPS attempts to draw a distinction between a letter sent directly to "the School Committee" and a letter sent (as the first letter was) to the "Fitchburg School District" or (as the second letter was) to the Mayor of the City of Fitchburg, this is a distinction without a practical difference. See *John Doe v. Cambridge Public Schools*, *supra* 101 Mass. App. Ct. at 486 (finding no practical distinction between the Cambridge Public Schools and the City of Cambridge for purposes of the presentment letter requirement at M.G.L. c. 258 § 4).

[13] Ms. Haywood did not attach copies of the presentment letters to the Amended Complaint because there was no apparent need to do so where no dispute existed that they were sent timely.  The letters refer to KG's name and contain inadmissible settlement communications which generally should not be docketed. However, Ms. Haywood will supplement this filing with redacted copies if the Court believes it would be helpful to resolving the instant motion.

explicitly refers to unlawful decisions to admit or exclude students, then to the extent it can be read to include an exhaustion requirement it should be read to include a corresponding futility exception where a school district acting unlawfully renders good-faith participation in administrative remedies pointless.

The facts of *Doe v. Holly* provide an instructive example when compared to the facts in this case. In *Doe v. Holly*, *supra*, the school district committed to conducting a "comprehensive investigation" into the bully concerns raised by one of the plaintiffs, but the plaintiffs refused to participate. Here, by contrast, Ms. Haywood sought action by FPS and FPS refused to engage with her at all let alone conduct any investigation. If the Court were to adopt FPS' position, then the law would punish claimants who step forward in good faith and reward deliberate indifference and gamesmanship on the part of municipalities and school districts.

    d.  <u>No authority supports FPS' argument that the Massachusetts Tort Claims Act supports dismissal of Ms. Haywood's claim pursuant to M.G.L. c. 76 §§ 5 and 16.</u>

Unable to cite any authority for the premise that M.G.L. c. 76 § 16 was nullified by the adoption of the Massachusetts Tort Claims Act (MTCA), FPS nevertheless argues that the decision in *Magliacane v. City of Gardner*, 483 Mass. 842 (2020) should be read to mean exactly that. That argument does not withstand scrutiny. The opinion in *Magliacane* is quite clear that it refers to "the legislative intent to repeal the common-law patchwork of exceptions to sovereign liability." *Id*. at 850. There is no indication, in *Magliacane* or anywhere else, that the Massachusetts legislature intended for the MTCA to supersede the remedial component of M.G.L. c. 76. Indeed, FPS' argument completely contradicts the SJC's decision in *Goodwin*, *supra*, where the SJC ordered the case remanded to the Superior Court so the plaintiff could pursue her claims pursuant to M.G.L. c. 76 § 16. *Goodwin*, *supra* 475 Mass. at 289.

Even if FPS were right that the MTCA supersedes M.G.L. c. 76 § 16, then it could only mean that the MTCA would afford her a remedy for the violations of M.G.L. c. 76 § 5. After all, FPS has conceded that M.G.L. c. 76 § 5 provides an adequate remedy. Because she has complied with the MTCA's presentment requirement, a mere relabeling of the claim as one brought pursuant to the MTCA would not result in dismissal of Ms. Haywood's claim. The federal pleading standard does not require counts to be explicitly labeled or even correctly labeled, but focuses on whether the complaint states "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Johnson v. City of Shelby*, Miss., 574 U.S. 10, 11 (2014) (per curiam) (federal pleading standard "do[es] not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted") and *Snyder v. Collura*, 812 F.3d 46, 50 (1st Cir. 2016) (complaint must "plead facts and not necessarily the specific names of the legal theories and causes of action fairly raised by these facts").

**VII.    Count VI states a claim for negligent infliction of emotional distress.**

FPS cites *Lanier v. President & Fellows of Harvard Coll.*, 490 Mass. 37, 46 (2022) for the basic proposition that a claim for negligent infliction of emotional distress requires "physical harm manifested by objective symptomatology." Yet FPS fails to mention that in *Lanier* the plaintiff's claim for negligent infliction of emotional distress was founded on "physical symptoms of insomnia and nausea," which the SJC held was sufficient to state a claim. *Id.* In this case, the symptoms alleged are similar if not more severe. The emotional distress has been manifested by loss of sleep and anxiety so severe that it causes KG to shake when she has her hair done.[14] Under Massachusetts law, that more than suffices for a claim of negligent infliction

---

[14] Amended Complaint, at Paragraphs 94-95.

of emotional distress.  FPS' citation to federal court decisions that predate the SJC's decision in

*Lanier* cannot save its argument. *Schlesinger*, *supra* 420 U.S. at 755 (federal courts bound by

state courts' interpretations of state law).

Ms. Haywood has not asserted a claim of emotional distress on her own behalf, so the

paragraph in FPS' memorandum apparently addressing such a claim is inapposite.[15]  Count VI

clearly says "FPS is liable to Ms. Haywood as KG's next friend for compensatory damages as

proven at trial."  KG is the young girl who was humiliated by her teacher in front of her

classmates; who was forced to tell her mother to remove the protective hairstyle that was an

essential expression of her family's cultural identity; who was forced to switch elementary

schools as a result of FPS' refusal to take any alternative action; and who continues to experience

physical symptoms as a result of the severe anxiety and distress resulting from those experiences.

## Conclusion

For the foregoing reasons, FPS' motion to dismiss should be ***denied*** except as to those

claims which Ms. Haywood has voluntarily waived.  Although federal courts have significantly

narrowed the reach of Title VI of the Civil Rights Act since its adoption in 1964, circumstances

such as those described in this case can still give rise to liability for race discrimination and the

denial of students' freedom of expression.  Additionally, Massachusetts law prohibits race

discrimination against students seeking to attend public schools and affords a remedy to those

students in the form of M.G.L. c. 76 § 16.  Although that statute requires school committees to

respond when claimants demand a reason for a denial of educational opportunities, it does not

require the exhaustion of administrative remedies before pursuit of litigation.  Finally, Ms.

Haywood can pursue a claim of negligent infliction of emotional distress on her daughter's

---

[15] As a result of an apparent typographical error, the paragraph refers to Ms. Haywood as "Ms. Halloway."

behalf based on the severe emotional distress caused by FPS' negligent actions and omissions and the related physical symptoms.

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1(d), the Plaintiffs requests the opportunity for oral argument on all issues presented by the Defendant's Motion to Dismiss.  Oral argument would serve to further clarify the parties' respective positions for the Court.

Respectfully submitted,

Plaintiff Kristine Haywood individually and as next friend of KG, a minor, By her attorney,

*/s/Benjamin C. Rudolf*
Benjamin C. Rudolf, BBO#: 667695
Rudolf, Smith, Griffis & Ruggieri, LLP
446 Main Street, Suite 1503
Worcester, MA 01608
p. (508) 425-6330
rudolf@rudolfsmith.com

Dated: October 22, 2024

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for the Defendant by email as well as automatically through filing it with the Court's CM/ECF system.

*/s/Benjamin C. Rudolf*
Benjamin C. Rudolf

Dated: October 22, 2024